**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| OBD SENSOR SOLUTIONS LLC, | § |
| | § |
| *Plaintiff*, | § |
| | § |
| v. | § CIVIL ACTION NO. 2:22-CV-00124-JRG-RSP |
| | § |
| TRACK WHAT MATTERS, L.L.C. d/b/a | § |
| RHINO FLEET TRACKING, | § |
| | § |
| *Defendant*. | § |

### CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

OBD Sensor Solutions LLC alleges infringement by Track What Matters, LLC (Rhino) of claims from U.S. Patent 7,146,346. The patent relates "to an electronic built-in on-board device, of a fuzzy-logic type . . . designed for monitoring, storing, processing and clustering data related to the operation of motor vehicles." '346 Patent at 1:7–11.

The parties dispute the scope of eight terms and phrases. For four terms, Rhino proposes a specific construction, while OBD asserts no construction is necessary. Rhino challenges the other four terms as indefinite. Having considered the parties' briefing and arguments of counsel during a May 18, 2023 hearing, the Court resolves the disputes as follows.

## I.     BACKGROUND

The patent notes the importance of on-board systems for collecting, processing, and monitoring operational data of motor vehicles. '346 Patent at 1:16–22. It characterizes prior-art systems as having low processing capability that "require a lot of preset parameters and dedicated sensors." *Id.* at 1:23–26. It also criticizes the prior art as having limited storage size, not fully

autonomous, and needing to be specific to a particular vehicle. *Id.* at 1:27–35. These drawbacks
affect reliability of the vehicle and increase the costs of the system. *Id.* at 1:41–45.

To address these drawbacks, the patent teaches a microprocessor control unit and fuzzy
logic software procedure that provides a full analysis of vehicle operating data. *Id.* at 1:57–61. This
helps enable fully autonomous operation. *Id.* at 1:61–63. The device can be integrated with the
vehicle's on-board electronic control units (ECUs) to process their data. *Id.* at 1:64–67.

The disputed terms and phrases relate to two independent apparatus claims—Claim 1 and
Claim 30. Five of the disputed terms relate to Claim 1, which recites:

1. An electronic device for monitoring and processing information
   data related to the use and functioning of motor vehicles through
   an inner network connecting vehicle sensors, said device
   comprising:

   a central processing unit;

   an integrated data storage connected to the central processing
      unit; and

   a network connector operatively connected to the central
      processing unit and configured to be connected to an inner
      network of a motor vehicle through a connector used by
      motor vehicle makers for accessing a vehicle on-board
      electric system with a diagnostic unit,

   said device being a stand-alone device *cooperating with the
      vehicle electronic dedicated control units*, via said network
      connector and through said inner network, and *processing
      information data* related to use and functioning of the motor
      vehicle received through said network connector and the
      inner network from connected vehicle sensors,

   said data received through said inner network being processed
      by said central processing unit and performed *analysis* being
      stored into said storage;

   an interface *connector* providing connection to one of a radio
      transmitter and a wireless unit; and

a front-end device and a bus connecting said network connector to said central processing unit; and

a further bus connecting said central processing unit to said storage,

wherein said device is coupled, through said on-board network connector, with one of an OBD- and an EOBD connector for interfacing the motor vehicle inner networks with an *outside network* of said motor vehicle.

'346 Patent at 6:8–43 (disputed terms italicized; reference numbers omitted). Claim 30 recites:

30. An electronic device for monitoring and processing data related to use and functioning of motor vehicles, said device comprising:

a central processing unit;

an integrated storage; and

a network connector for connection to an inner network of a motor vehicle including sensor electronic dedicated control units,

wherein said central processing unit is to receive information data relating to the motor vehicle from said sensor electronic dedicated control units through said inner network and is to process the received information data into statistical distributions, and

wherein said storage is mapped so as to store said statistical distributions into *genes* and *DNA* arrays,

wherein said information data are formed as statistical distributions into *genes* and the *genes* are in turn clustered into *parameter matrix DNAs* defining one of a user type and a motor vehicle use type.

*Id.* at 9:1–10:2 (disputed terms italicized; reference numbers omitted). The "genes" and "DNA" terms also appear in Claim 6, which depends from Claim 1. *Id.* at 6:59–61.

## II.    GENERAL LEGAL STANDARDS

### A.    Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B.     Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id.* at 908. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III.     THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, OBD asserts a skilled artisan at the time of the invention was "'someone with a degree in a suitable engineering discipline such as electronic or electrical engineering together with at least two years of work experience with automotive electronics systems, for example ECUs and vehicle networks.'" Goldberg Decl., Dkt. No. 40-1 ¶ 31. Rhino does not challenge this level of skill, which the Court adopts for its analysis.

## IV.     RHINO'S CHALLENGE TO THE GOLDBERG DECLARATION

Relying on P.R. 4-3(b), Rhino asks the Court to strike OBD's expert's declaration as untimely. Dkt. No. 42 at 4–5. According to Rhino, OBD did not disclose its expert's positions until April 6, 2023, when it attached Dr. Steven Goldberg's declaration as an exhibit to its opening claim-construction brief. *Id.* at 6. OBD does not contest these facts, but argues the declaration was not required with its P.R. 4-3 disclosures because it was not calling Dr. Goldberg as a live witness at the claim-construction hearing. Dkt. No. 45 at 2–3. And if even if it was, says OBD, Rhino cannot show prejudice. *Id.*

The local patent rules require that each party, with the Joint Claim Construction and Prehearing Statement, "also simultaneously serve a disclosure of expert testimony consistent with

Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii) or 26(a)(2)(C) for any expert on which it intends to rely to support its proposed claim construction or indefiniteness position or to oppose any other party's proposed claim construction or indefiniteness position." P.R. 4-3(b). Rule 26(a)(2)(B), which applies to Dr. Goldberg as an expert "retained or specially employed to provide expert testimony," requires "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B).

Here, the parties filed the Joint Claim Construction and Prehearing Statement on February 23, 2023. *See* Dkt. No. 37. For each term at issue, OBD identified a specific section of "Goldberg Expert Decl.," noting that term "refers to the 'Declaration Of Dr. Steven H. Goldberg Regarding The Meaning Of Certain Terms In The Asserted Patent' dated February 22, 2023." Dkt. No. 37-1 at A1 n.2. During the hearing, OBD explained Goldberg's declaration was not provided at that time due to a clerical oversight.

The Court agrees with Rhino that Dr. Goldberg's declaration should not be considered. Regardless, the Court has reviewed the declaration with OBD's arguments and finds it conclusory and unpersuasive. Thus, even if the Court did consider the declaration, it would not change the constructions set forth *infra*. This opinion references the Goldberg declaration only to explain in detail why it is not persuasive.

## V.      THE DISPUTED TERMS

### A.      "cooperating with the vehicle electronic dedicated control units" (Claim 1)

| OBD's Construction | Rhino's Construction |
|---|---|
| No construction necessary. | Plain and ordinary meaning, which is "acting or working together, where the ECU and the monitoring device exchange information in both directions" |

The parties dispute whether "cooperating with" requires information flow both to and from the ECUs controlling the motor vehicle. Noting the claim language recites receiving and processing data, Rhino first argues if that were the extent of this term's scope, "cooperating" would do no work; thus, the word must mean more. Dkt. No. 42 at 14. Next, says Rhino, the specification confirms "cooperating with" means a "two-way exchange of information." *Id.* at 14–15 (quoting, *inter alia*, '346 Patent at 1:49–2:30). Finally, Rhino points to a dictionary definition of "cooperate": "Of a person: to work with one another or others towards the same end, purpose, or effect; to collaborate." *Id.* at 15 (citing *cooperate*, Oxford English Dict. (3d ed. 2022), Dkt. No. 42-10 at 1 (def. 1.b)).

According to OBD, the claim itself shows "cooperating with" only means the device receives and processes information from various sensors, so there is no two-way communication of information. Dkt. No. 40 at 5–6. It argues that embodiments requiring the provision of data from the claimed device to the ECU relate to statistical processing, which is addressed in Claim 5 rather than Claim 1. *Id.* at 5–6. OBD also stresses Rhino's dictionary definition says nothing about communication. *Id.* at 7.

The Court agrees with OBD. First, the claim language does not support Rhino's position. In the same limitation where "cooperating" appears, Claim 1 recites that the device processes

information received through a network connector. '346 Patent at 6:22–27. Rhino argues if that is the extent of "cooperate" the term would do no work, but that position presumes the scope of "cooperate" relates to information flow in the first place.

The Court is not persuaded of that position. For one, Rhino's proffered definition—"to work with one another or others towards the same end, purpose or effect"—says nothing about communication, much less bi-directional communication of substantive information. Nor does a more apt definition from the same source: "Of a thing: to work in combination with something else to produce an effect." Oxford English Dict. (3d ed. 2022), Dkt. No. 42-10 at 1 (def. 1.a)).

For its part, the specification seems to separate the notions of "cooperation" and "communication." For example, the Summary explains:

> [T]he aim of the present invention is . . . to properly record and process operating data of the motor vehicle the device is installed on, and *cooperate*, in a fully compatible manner, with onboard networks and systems, *as well as properly poll electronic dedicated control units* (ECU's) controlling motor vehicles.
>
> [This] aim is achieved by an electronic microprocessor control unit, and a related software procedure, providing, based on fuzzy-logic principles, a full analysis of said operating data for deriving therefrom statistic index arrangements, thereby providing a control unit having a fully autonomous operating data managing capability.

'346 Patent at 1:50–63 (emphasis added). Thus, the communication—here, the polling of the ECUs—is discussed apart from the cooperation. Moreover, nothing in this broad description of the invention requires a return of data or parameters to the vehicle, which is discussed elsewhere in the patent and claims. *See id.* at 2:26–30 ("Yet another object of the present invention is to statistically process, in a fully autonomous manner, all the operation data and *to return to the on-board ECU's further operating data related to motor vehicle sub-system operation*." (emphasis added)); *id.* at 6:54–58 (reciting, in Claim 5, the device "is directly interfaced with the sensors and

with actuators, *to provide enhanced operating parameters* including statistical parameters defining usage procedures of motor vehicle sub-systems" (emphasis added)). Nor does either the Title or Abstract suggest returning information to the on-board ECUs. *See id.* at [54] ("Fuzzy-Logic On Board Device for Monitoring and Processing Motor Vehicle Operating Data"); *id.* at [57] ("[a] fuzzy-logic on-board device for [monitoring] and processing motor vehicle operating data").

Back to the claim language, the longer clause in which this term appears establishes the separate, or "stand-alone," nature of the device, but does not limit the nature of the communication. *See id.* at 6:21–22 ("said device being a stand-alone device cooperating with" the ECUs). Structurally, a "stand-alone device" that is "cooperating with" another device must be compatible with that device to work together, a concept reinforced by the Summary. *See id.* at 1:52–55 ("to properly record and process operating data of the motor vehicle the device is installed on, and *cooperate, in a fully compatible manner,* with onboard networks and systems" (emphasis added)). Accordingly, the Court construes this phrase as "compatible with the vehicle electronic dedicated control units."

### B.    "processing information data" (Claim 1)

| OBD's Construction | Rhino's Construction |
|---|---|
| No construction necessary | "Performing the 'analysis' on the data" |

Claim 1's fourth and fifth limitations recite:

> said device . . . *processing information data* related to use and functioning of the motor vehicle received through said network connector and the inner network from connected vehicle sensors,

> said data received through said inner network being processed by said central processing unit and *performed analysis* being stored into said storage[.]

'346 Patent at 6:21–30 (emphasis added). Rhino contends "processing information data" in the fourth limitation provides the antecedent for "performed analysis" in the fifth limitation. Dkt. No. 42 at 18. In other words, in Rhino's view, "'processing information data' necessarily means performing the 'analysis.'" *Id.*

OBD argues no construction is needed because the phrase is understandable. It relies on its expert's declaration, in which Dr. Goldberg offers a single conclusory sentence about the term: "The term 'Processing information data' is used in Claims 1, 2, 4, 5, 6, and 7 of the '346 Patent and is clear and unambiguous, and it requires no construction." Goldberg Decl., Dkt. No. 40-1 ¶ 34.

The Court agrees with Rhino. A skilled artisan would understand from the fifth limitation the "analysis" is a storable result or output of the "process[ing] by the [CPU]." Further, the fifth limitation narrows "processing information data" in the fourth limitation, requiring the processing to be by the "central processing unit." Dr. Goldberg's conclusory statement on this question does nothing to dispel this plain reading of the claim language. The Court gives this term its plain and ordinary meaning, but will more fully address the relationship between "performed analysis" and "processing information data" with its construction of "analysis."

C.      **"analysis" (Claim 1)**

| OBD's Construction | Rhino's Construction |
|---|---|
| No construction necessary. | Plain and ordinary meaning, which is the result of a detailed evaluation of the data set to understand the nature of its parts and their relationship. |

Rhino accuses OBD of reading this term to include "ministerial processing tasks that require no analysis, like formatting, rounding, [and] truncating." Dkt. No. 42 at 16. The

specification, says Rhino, repeatedly uses "analysis" to describe a "a detailed and thorough computation involving fuzzy logic and statistical analysis." *Id.* Relying on Dr. Goldberg's declaration, OBD asserts "'analysis' is clear and unambiguous on its face, and it requires no construction." Dkt. No. 40 at 7 (citing Goldberg Decl., Dkt. No. 40-1 ¶ 35). In its reply, OBD characterizes Rhino's concerns as "hypothetical and unexplained," and therefore not a justification to "rewrite" the term. Dkt. No. 45 at 6. Further, OBD notes the subjective nature of certain terms in Rhino's construction, like "detailed" and "nature." *Id.* at 7.

The Court agrees with Rhino that "analysis" requires more than low-level processing tasks. For one, the patent consistently refers to fuzzy logic and statistical analysis as part of the inventive concept. *See* '346 Patent at [54] ("Fuzzy-Logic On Board Device for Monitoring and Processing Motor Vehicle Operating Data"); *id.* at [57] ("a fuzzy-logic on board device for [monitoring] and processing motor vehicle operating data"); *id.* at 1:57–63 (noting the invention's principal aim "is achieved by an electronic microprocessor control unit, and a related *software procedure*, *providing, based on fuzzy-logic principles*, *a full analysis* of said operating data for *deriving therefrom statistic index arrangements*" (emphasis added)); *id.* at 4:1–6 (referring to nested reiterating cycles where "[t]he inner cycle of said cycles provides DNA genes [and] the outer cycle selects said genes according to a fuzzy logic, collects two of the most similar DNAs, updates them and stores the method results"). Moreover, Dr. Goldberg's declaration is conclusory as to the scope of "analysis." *See* Goldberg Decl., Dkt. No. 40-1 ¶ 35 (noting only that "[t]he term 'analysis' . . . is clear and unambiguous, and it requires no construction" and a skilled artisan "would understand this term to mean that data are received and analysis is performed on that data").

Considering the specification, a skilled artisan would not understand "analysis" as only basic calculations like formatting, rounding, and truncating. That said, Rhino's construction

introduces too much subjectivity into the term with words like "detailed" and "nature." Accordingly, given the guidance *supra*, the Court rejects that any specific construction is necessary to address the scope of "analysis," but holds "performed analysis" means "the result of the processing by the central processing unit," which refers to the "processing information data" recited in the fourth limitation.

### D.      "interface connector" (Claims 1, 7)

| OBD's Construction | Rhino's Construction |
|---|---|
| No construction necessary. | "Plain and ordinary meaning, which is physical connector." |

The parties dispute whether the recited "interface connector" must be a physical connector (Rhino's position) or whether it can also be a "wireless connector" (OBD's position). Rhino asserts the patent only discloses physical connectors, Dkt. No. 42 at 9, whereas OBD stresses the word "physical" never appears in the patent, Dkt. No. 40 at 8; *see also* Goldberg Decl., Dkt. No. 40-1 ¶ 37 ("There is nothing in the '346 Patent or its prosecution history that limits the 'interface connector' to a physical connection. A POSITA would understand 'connector,' in the context of providing an 'interface' between two or more electronic devices, *i.e.*, an interface connector," to be either physical or wireless.").

The Court agrees with Rhino that the claimed "interface connector" provides a physical connection and does not include devices that provide wireless "connections," such as wireless modems. Rhino presents extrinsic evidence a skilled artisan would understand "connector" as a physical device for providing a physical (rather than wireless) connection. Dkt. No. 42 at 12–13 (citing *connector*, Oxford English Dict. (3d. ed. 2022), Dkt. No. 42-7 at 2 ("[a] device for holding two parts of an electrical conductor in intimate contact"). Likewise, industry-specific dictionaries show "connector" is used in the computer and electronics fields to refer exclusively to physical

connectors. *See connector*, Dict. of Comput. & Internet Terms (12th ed. 2017), Dkt. No. 42-8 at 112 (defining "connector" by reference to physical connectors such as "USB," "HDMI," and "ethernet")).

OBD presents no persuasive evidence to the contrary. At best, OBD proffers two conclusory paragraphs from its expert, which do not provide any reasoning as to how or why a skilled artisan would understand "connector" to mean a wireless modem. Instead, he equates "connections" with "connectors." *See* Goldberg Decl., Dkt. No. 40-1 ¶¶ 36–37. While a corresponding pair of wireless transceivers may provide a "wireless connection" between two points, "connection" is not the disputed term.

OBD also makes two specification-related arguments, but neither is persuasive. First, the absence of the word "physical" is not dispositive of how a skilled artisan would understand the term. After all, if a skilled artisan would understand "connector" as something physical, use of the word "physical" is unnecessary.

Second, although OBD contends the patent does not disclose a physical connection between the interface connector and the radio transmitter, Dkt. No. 40 at 9, the Court concludes otherwise. Figure 8 shows the interface connector (2) as a simple 4-pin header. Moreover, a skilled artisan would understand item (2) of Figure 7 to be the same as item (2) of Figure 1, which the patent describes as "very simple" with the interface connector (2) coupled to the CPU through line (5).

Based on the intrinsic and extrinsic evidence, the Court construes "interface connector" as "physical interface connector." Thus, the Court rejects OBD's contention the term's scope includes a wireless adaptor or modem.

### E.    "outside network of said motor vehicle" (Claim 1)

| OBD's Construction | Rhino's Construction |
|---|---|
| No construction necessary. | Indefinite |

Rhino argues this term is nonsensical, and therefore indefinite. Dkt. No. 42 at 19. Specifically, it claims "the natural reading of this phrase is that the vehicle has two networks that are built into the vehicle, one 'inner' and another 'outside,'" which (in its view) makes no sense. *Id.* OBD characterizes Rhino's position as simply attorney argument. Dkt. No. 45 at 10.

This term is not indefinite. The specification refers to interfacing with the outside of the motor vehicle shared networks. *See* '346 Patent at 6:22–25 (explaining "motor vehicle makers conventionally use a connector 40, the so-called O[B]D or EOBD, or other like connector, for interfacing with the outside of the motor vehicle shared networks"). The disputed claim language simply tracks that concept, but with the further limitation that the interface be to another network. Thus, the Court construes this phrase as "a network outside of said motor vehicle."

### F.    "genes" and "DNA" (Claims 6, 30)

| Term | OBD's Construction | Rhino's Construction |
|---|---|---|
| "genes" | "statistic parameters" | Indefinite |
| "DNA | "a statistic parameter array" | Indefinite |

Claim 6 requires the "storage" of Claim 1 to be "mapped so as to store information data in *genes* and *DNA* combinations thereof." '346 Patent at 6:59–61. Claim 30 includes similar language. *Id.* at 9:33–10:2 (requiring storage "mapped so as to store . . . statistical distributions into *genes* and *DNA* arrays" and information data "formed as statistical distributions into *genes* and the genes are in turn clustered into parameter matrix *DNA*s" and combinations thereof).

OBD argues each term is defined by the specification in line with its proposed constructions. Dkt. No. 40 at 11–12 (citing '346 Patent at 4:7–8, 2:22–24). Rhino argues these terms are indefinite in part because the supposed definitions are different than how the specification and claims refer to the terms. *See generally* Dkt. No. 42 at 21–24. It relies heavily on *TVnGO Ltd. (BVI) v. LG Elecs. Inc.*, 861 F. App'x 453 (Fed. Cir. 2021), which concluded certain claim terms were indefinite based on inconsistency in how the terms were used in the claims versus the specification. *Id.*



**FIG. 3 of the '346 Patent**

The relevant text relates to Figure 3 (above), which shows three types of "genes": (1) multidimensional distributions of samples; (2) unidimensional distributions; and (3) parametric values. For example, rows 26–27 show clustered distributions (e.g., vehicle speed and acceleration). '346 Patent at 4:19–22; *see also id.* at 4:36–38 (noting, for example, "a gene can be represented by a clustered speed and acceleration distribution"). Rows 28–29 show a single-parameter histogram. *Id.* at 4:23–24. Alternatively, a "gene" may simply be a value, such as a statistical mean or offset, as shown in Row 30. *Id.* at 4:25–26.

To start, the Court agrees with OBD that the applicants defined these terms. Specifically, the patent defines a "DNA" as "a statistic parameter array." *See* '346 Patent at 2:22–24 ("so-called 'DNA', i.e. a statistic parameter array"). Further, the patent explains "[t]he definition of a DNA is characterized by the structure thereof, and not by its contents." *Id.* at 4:17–18. Consistent with this, the patent explains "genes represent statistic parameters, whereas a DNA essentially represents a parameter matrix." '346 Patent at 4:7–8. But what is a "statistic parameter"?

According to Rhino, "statistic parameter" is not used consistently in the patent. Dkt. No. 42 at 22. And even if it was, it is not sufficiently clear for a skilled artisan to understand its scope with reasonable certainty. *Id.* Ultimately, Rhino contends the term is invalid based on "intra-patent inconsistencies." *Id.* at 23 (citing *TVnGo*, 861 Fed. App'x at 460).

In *TVnGo*, the parties disputed the meaning of "overlay activation criteria" and "overlay activation signal," which generally referred to producing icons over a conventional TV broadcast, *TVnGo*, 861 Fed. App'x at 456–57. The terms were only in the claims, having been added during prosecution. *Id.* at 458. The specification described activating an *already overlaid* icon to display IP content over the broadcast content. *Id.* The claims, however, recited "respond[ing] to an overlay activation criterion to cause the display screen *to display the overlays*." *Id.* (emphasis added). The

court concluded the patent taught two different results—"display of IP content associated *with an already displayed overlay* versus *display of an overlay in the first place*—without reasonable certainty as to which reading is correct." *Id.* at 459 (emphasis added).

This is different. Here, Rhino does not explicitly allege inconsistency between the claims and the specification. Instead, Rhino references the many terms and phrases possibly used for "gene"—for example, "parameter genes," "statistical data," "multi-dimensional statistical parameters," "one-dimensional statistical parameters," "single parameters," and "statistical distributions." Dkt. No. 42 at 22. But the question is whether the meaning of "gene," despite the various phrases connected to it, may nonetheless be found by reading the intrinsic record. *See Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." (citations omitted)).

It can, because of Figure 3 and the related text. Although Rhino asserts that "parameters" are generally constraints or inputs, Dkt. No. 42 at 23, a complete reading of the patent shows the applicants used the term to refer broadly to statistical distributions and values. *See* '346 Patent at 4:19–36. Accordingly, the Court construes "genes" as "statistical parameters," and "DNA" as "statistical parameter array." The Court further notes a "statistical parameter" is a statistical distribution or value. These terms are not indefinite.

### G.      "parameter matrix DNAs" (Claims 6, 30)

| OBD's Construction | Rhino's Construction |
|---|---|
| No construction necessary; not indefinite. | Indefinite |

Rhino challenges this term as indefinite with one paragraph:

> The term "parameter matrix DNAs" is indefinite both because it incorporates the indefinite term "DNA," as explained above, and, relatedly, because it cannot be reconciled with OBDSS's proffered definition of DNA, as also discussed above. If "DNA" means "statistic parameter array," then "parameter matrix DNA" necessarily must mean "parameter matrix statistic parameter array," which is nonsensical and thus indefinite.

Dkt. No. 42 at 25.

No doubt the language throughout the specification and claims is sloppy—possibly because of translation issues[1]—but sloppy claim language does not render claims per se indefinite. *See Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1372 (Fed. Cir. 2010) ("An ungainly claim is not . . . indefinite, when its meaning can be understood by a person experienced in the field of the invention, on review of the patent documents."). Here, Claim 30 earlier refers to storage mapped to store DNA arrays. '346 Patent at 9:13–14. This limitation forms "information data" into "genes" for storage, thus suggesting a "parameter matrix DNA" is the same as a "DNA," even though this means different claim terms having the same scope.[2] Moreover, the surrounding claim language tracks that from the specification defining "DNA." *Compare* '346 Patent at 9:16–10:2 ("genes are clustered into parameter matrix DNAs defining one of a user type and a motor vehicle

---

[1] The underlying application claims the benefit of an Italian application. '346 Patent at [30].

[2] In the absence of contrary evidence, courts presume different terms have different meanings. *CAE Screenplates, Inc. v. Heinrich Fiedler Gmbh & Co. Kg*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).

use type"), *with id.* at 4:8–10 ("a DNA essentially represents a parameter matrix and a synthetic

frame, defining a user type or a motor vehicle use type condition"). Figure 3, the only figure

showing genes and DNA, supports this interpretation. As such, the Court holds this term is not

indefinite and adopts the construction of "statistical parameter arrays."

## VI.    CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "cooperating with the vehicle electronic dedicated control units"<br>(Claim 1) | "compatible with the vehicle electronic dedicated control units" |
| "processing information data"<br>(Claim 1) | Plain and ordinary meaning |
| "analysis"<br>(Claim 1) | "performed analysis" means "the result of the processing by the central processing unit" |
| "interface connector"<br>(Claims 1, 7) | "physical interface connector" |
| "outside network of said motor vehicle"<br>(Claim 1) | "network outside of said motor vehicle" |
| "genes"<br>(Claims 6, 30) | "statistical parameters" |
| "DNA"<br>(Claims 6, 30) | "statistical parameter array" |
| "parameter matrix DNAs"<br>(Claim 30) | "statistical parameter arrays" |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other

party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the

parties to refrain from mentioning any part of this opinion, other than the actual positions adopted

by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 11th day of June, 2023.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE